# In the United States Court of Federal Claims

No. 23-40
February 7, 2023
NOT FOR PUBLICATION

---

**THOMAS CREEK LUMBER AND LOG CO.,**

*Plaintiff,*

v.

**UNITED STATES,**

*Defendant.*

---

*D. Brent Carpenter*, Jordan Ramis PC, Portland, Oregon, for the plaintiff.

*Natalee Allenbaugh*, Commercial Litigation, Civil Division, U.S. Department of Justice, Washington, D.C., for the defendant.

## MEMORANDUM OPINION AND ORDER

***HERTLING*, Judge**

 In this breach of contract case, the plaintiff seeks relief from the United States Forest Service's termination of a timber-sale contract following a forest fire that affected the area of the timber the plaintiff was to harvest under the contract. Nearly a year after the fire, the Forest Service proposed modifications to the contract in a letter to the plaintiff titled "Modification for Catastrophe." After a year passed without the plaintiff either accepting or rejecting the proposed modifications, the Forest Service terminated the contract pursuant to the contract's termination for catastrophe provision. The plaintiff then filed a claim with the contracting officer, alleging that the Forest Service breached the contract, entitling the plaintiff to recover its out-of-pocket expenses. The contracting officer denied the claim. Following the denial of its claim, the plaintiff filed this suit. The defendant has moved to dismiss the amended complaint.

 The amended complaint does not plausibly state claims under the contract for three of its four claims. Those claims, Claims I, II, and IV, are dismissed. Claim III, however, does plausibly allege that the defendant failed to comply with a contract provision that was a prerequisite to the contract's termination by not including a required rate redetermination in the proposed contract modification. The parties disagree on whether the proposed modification included a rate redetermination; that disagreement raises a factual dispute inappropriate for resolution on a motion to dismiss. Dismissal of Claim III at this stage would be premature. Accordingly, the defendant's motion is granted in part and denied in part.

# I.       BACKGROUND AND PROCEDURAL HISTORY

On April 1, 2019, Thomas Creek Lumber and Log Co. ("Thomas Creek") contracted with the Forest Service to buy and harvest timber in the "Roaring 2 SBA" area in the Willamette National Forest in Oregon.  After Thomas Creek had performed the road reconstruction and nearly half of the marking, felling, bucking, yarding, and decking required by the contract, the Lionshead forest fire burned through the sale area in September 2020.  The Forest Service thereafter restricted access to the sale area.

The contract has several, interlocking provisions that govern the parties' conduct in the event of a catastrophe like the Lionshead fire.[1]  Section B2.113 defines a catastrophe as a "major change or damage to Included Timber on Sale Area, to Sale Area, [or] to access to Sale Area." The effect must be a result of "forces, or a combination of forces, beyond control of Purchaser, occurring within a 12-month period, including . . . fire," and the forces must affect a threshold amount of the available trees' value. The parties agree that the Lionshead fire caused catastrophic damage to the sale area.  The catastrophe provisions relevant to this case are section B8.22 and its subsection B8.222, section B8.32, and section B3.32.  The plaintiff's arguments also draw upon section B8.33 and related section B8.34.

When a catastrophe occurs, the parties' obligations begin with B8.32, "Modification for Catastrophe."  That section requires first that the Forest Service, "in consultation with Purchaser," outline the effects of the catastrophe on a sale area map.  From there, the Forest Service "may propose contract modification to permit the harvest of catastrophe-affected timber."  If the purchaser accepts the Forest Service's modification, the contract is then modified to include rates as redetermined according to section B3.32.

Section B3.32, "Rate Redetermination after Catastrophic Damage," dictates in detail how the Forest Service must conduct a rate redetermination "in the event of Catastrophic Damage and adjustment, if any, of Included Timber."  For each species in the contract, the Forest Service "shall make an appraisal to determine . . . the catastrophe-caused difference between the appraised unit value" before the catastrophe and the value after.

After the Forest Service proposes modifications to the purchaser, section B8.22 governs termination for catastrophe, with subsections devoted to termination by the purchaser and by the Forest Service.  Section B8.22 expressly states that termination for catastrophe "shall not be considered termination under B8.34," which would entitle the purchaser to out-of-pocket

---

[1] Absent a catastrophe, the contract allows for other types of modification and termination in sections B8.33 and the related B8.34.  Unlike the contract's catastrophe provisions, Sections B8.33 and B8.34 allow the purchaser to recover out-of-pocket expenses.  Section B8.33 governs several types of contract modification and suspension.  Relevant here is B8.33(a)(i), which allows a contracting officer to modify the contract to "prevent environmental degradation or resource damage."  Section B8.341 allows the Forest Service to terminate a contract for "any of the reasons set forth in paragraph (a) of B8.33."

expenses.  The provision allowing for termination by the Forest Service, B8.222, provides that the contracting officer may terminate the contract if the purchaser does not accept the modification within 30 days of receipt.

The contracting officer determined that the Lionshead fire had caused "catastrophic damage" within the meaning of the contract and in July 2021 sent Thomas Creek a proposed "Modification for Catastrophe."  The proposed modification relied on the contract's provisions covering catastrophic damage, specifically sections B2.133 and B8.222.  The modification proposed removing 16,602 tons of the estimated total 28,604 tons of timber from the sale area, leaving 12,002 tons available.[2]  In addition, the proposed modification explained that "additional mitigation measures in the fire impacted cutting units have been made to account for the changed conditions due to effects caused by the Lionshead fire."  These measures included "an increase to riparian buffers along stream courses and additional Northern Spotted Owl requirements."

Thomas Creek did not respond to the proposed modification, and one year later, on July 18, 2022, the contracting officer sent Thomas Creek a letter terminating the contract.  As in the proposed modification, the termination letter relied on sections B2.133 and B8.222 as the bases on which the Forest Service was terminating the contract.

Under the Contract Disputes Act ("CDA"), Thomas Creek submitted a timely claim to the contracting officer on September 13, 2022.  Thomas Creek alleged that the Forest Service violated the contract by failing to compensate Thomas Creek for its partial contract performance and sought appropriate compensation for road maintenance and logging costs.

The contracting officer denied the claim, finding that the contract's termination provision for catastrophic damage, section B8.222, did not entitle Thomas Creek to the out-of-pocket expenses that the contract might allow in other types of termination.  Because Thomas Creek did not accept the contracting officer's July 2021 modification proposal within 30 days of receipt, the contract was subject to termination under section B8.222 of the contract.  Termination under this section does not entitle the purchaser to out-of-pocket expenses.

After receiving the contracting officer's denial of the claim, Thomas Creek filed this suit in January 2023.  From June 2023 to September 2023, the parties attempted unsuccessfully to resolve this claim and an indirectly related claim, *Thomas Creek Lumber and Log Co. v. United*

---

[2] The plaintiff notes a discrepancy between the removal figure in the July 2021 modification and the July 2022 termination letter.  In the termination letter, the contracting officer noted that 12,983 tons of timber had been removed from the sale area.  The discrepancy is immaterial to the pending motion.

*States*, No. 19-1742, by engaging in alternative dispute resolution before Judge Bonilla.[3] Following the conclusion of alternative dispute resolution, the plaintiff amended its complaint.

The amended complaint alleges (I) that the plaintiff is entitled to out-of-pocket expenses because the "defendant took nearly a year . . . to send the Modification for Catastrophe" and the modifications were "environmental in nature . . . within the scope of [sections] B8.33 and B8.34"; (II) that the defendant delayed contract performance for nearly a year; (III) that the defendant "failed to perform a rate redetermination in accordance with B8.32"; and (IV) that the defendant must return to the plaintiff $44,921.73 in road maintenance fees for lumber which the plaintiff could not extract as a result of the fire.

The defendant moved to dismiss the amended complaint, the plaintiff responded, and the defendant replied. Oral argument was held by video conference on February 7, 2024, and this opinion reflects an oral ruling rendered at the close of oral argument.

## II.    JURISDICTION

The Tucker Act, 28 U.S.C. § 1491(a), vests in the Court of Federal Claims jurisdiction over claims for money damages against the United States:

> The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1).

The Court of Federal Claims has jurisdiction over claims for breach of contract founded upon an express contract with the United States. *Hercules Inc. v. United States*, 516 U.S. 417, 422 (1996). Here, the plaintiff's claim is founded on an express contract with a federal agency.

Claims founded on an express contract are generally governed by the CDA. 41 U.S.C. § 7104(b)(1). A court may hear a claim under the CDA only after that claim has been "submitted to the relevant contracting officer," and the officer "issued a final decision on that claim." *K-Con Bldg. Systems, Inc. v. United States*, 778 F.3d 1000, 1005 (Fed. Cir. 2015). A claim submitted to a contracting officer must provide a "'clear and unequivocal statement that gives the contract officer adequate notice of the basis and amount of the claim.'" *Id.* (quoting *Contract Cleaning Maint., Inc. v. United States*, 811 F.2d 586, 592 (Fed. Cir. 1987)).

---

[3] The settlement discussions in the two cases occurred after summary judgment had been denied in *Thomas Creek Lumber and Log Co. v. United States*, No. 19-1742, 2023 WL 2056316 (Fed. Cl. Feb. 17, 2023), and before the defendant moved to dismiss this case.

The defendant argues that the plaintiff did not first submit to the contracting officer in its September 2022 claim the same claims it is pursuing through this litigation.  The defendant argues that the plaintiff failed to present to the contracting officer any claims "related to an insufficient or absent rate redetermination" or "that the contract was 'constructively terminated' under B8.33 and B8.34."  Indeed, the defendant argues that the plaintiff's "claim to the contracting officer was so vague, it can hardly be said to allege any facts at all."  As a result of this vagueness, the defendant argues that the claims raised in the amended complaint were not presented to the contracting officer, and the court lacks jurisdiction to hear them under the CDA.

The CDA does not require a claim raised in a judicial complaint to be identical to the claim presented to the contracting officer.  Instead, the claim must "arise from the same operative facts [and] claim essentially the same relief."  *Scott Timber Co. v. United States*, 333 F.3d 1358, 1365 (Fed. Cir. 2003).  It is acceptable for the claims to the contracting officer and to the Court of Federal Claims to "assert differing legal theories for that recovery," so long as the contracting officer had "'adequate notice of the basis and amount of the claim'" that ultimately comes before the court.  *Id.* (quoting *Contract Cleaning*, 811 F.2d at 592).

Here, the plaintiff filed its claim with the contracting officer in response to the Forest Service's July 2022 termination of the contract for catastrophe.  The claim alleged that the termination by the Forest Service was "arbitrary[, capricious,] and negligent and clearly in violation of the contract."  In tandem with the termination, the plaintiff claimed that the Forest Service "fail[ed] to properly compensate the purchaser for all costs incurred by the purchaser as required by the contract."  The plaintiff sought $90,715.96 for the Forest Service's breach.

The contracting officer denied the plaintiff's claims. The written decision reviewed the entire timeline of the contract, quoted the relevant provisions of the contract, identified the contract's catastrophe provisions under which the Forest Service terminated the contract, and noted that the Forest Service had performed a rate redetermination.  While the plaintiff's claim to the contracting officer is, as the defendant points out, factually sparse, the contracting officer's decision reflects that the contracting officer understood the nature of the plaintiff's claims and addressed them in a thorough 15-page decision.

The two main claims that the plaintiff raises in its amended complaint, that the contract was terminated under section B8.34 rather than section B8.22, and that the Forest Service failed to perform a compliant rate redetermination under section B8.32, were both addressed in the contracting officer's decision.  The decision explained that, because the damage caused by the Lionshead fire met the contract's threshold for "catastrophic damage," the modifications proposed by the Forest Service in response to that damage were governed by section B8.222 of the parties' contract and not either section B8.33 or section B8.34.  The determination that section B8.222 governed the Forest Service's termination demonstrated that the contracting officer had notice of the plaintiff's claims relating to the terms of the proposed modifications.  In considering the proposed modification for catastrophe, the contracting officer also determined, without thorough explanation, that the Forest Service's proposed modification "included a rate redetermination after an appraisal was completed pursuant to [section] B3.32."  This explanation reflects that the contracting officer also had notice of the plaintiff's claim that the Forest Service had failed to complete a compliant rate redetermination.

5

After noting that the fire had caused catastrophic damage and that the Forest Service conducted a rate redetermination, the contracting officer rejected Thomas Creek's $90,715.96 claim for its out-of-pocket expenses because (a) the contract was terminated for catastrophe, not for environmental reasons, and (b) the proposed modification for catastrophe sent to the plaintiff in July 2021 "included a Rate Redetermination."

Finding that the plaintiff's sparse claim did not put the contracting officer on notice as to the basis on which the plaintiff sought compensation under the contract would be inconsistent with how the contracting officer himself addressed the underlying facts in denying the claim. The contracting officer's treatment of the plaintiff's claim shows that he had notice of the basis and amount of the claim. Accordingly, jurisdiction in the Court of Federal Claims over the plaintiff's amended complaint is appropriate.

## III.   STANDARD OF REVIEW

The defendant has moved to dismiss the plaintiff's complaint pursuant to Rules of the Court of Federal Claims ("RCFC") 12(b)(6). Dismissal for failure to state a claim upon which relief can be granted "is appropriate when the facts asserted by the claimant do not entitle [the claimant] to a legal remedy." *Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002). A court must both accept as true a complaint's well-pleaded factual allegations, *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009), and draw all reasonable inferences in favor of the non-moving party. *Sommers Oil Co. v. United States*, 241 F.3d 1375, 1378 (Fed. Cir. 2001).

To avoid dismissal, a complaint must allege facts "plausibly suggesting (not merely consistent with)" a showing that the plaintiffs are entitled to the relief sought. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556).

## IV.   DISCUSSION

The plaintiff alleges in its amended complaint that the defendant breached the contract by failing to follow the contract's termination procedures. The complaint's four counts effectively assert two basic claims for relief. First, the plaintiff alleges that the defendant breached the contract when it sent the plaintiff a proposed contract modification that, despite being labelled "Modification for Catastrophe" in accordance with section B8.222, proposed only changes that were "environmental in nature." As a result, the modifications "were clearly within the scope of [section] B8.33," and thus entitle the plaintiff to its out-of-pocket expenses under section B8.34. Second, the plaintiff alleges that the defendant failed to follow the termination provisions required by section B8.32, which sets forth the procedures the Forest Service must follow in proposing a modification for catastrophe. The plaintiff alleges that the defendant breached the required procedures, and thus the contract, by failing to perform the rate redetermination required under section B8.32.

**A.      Claims I and II**

The amended complaint's first claim alleges that the termination failed to comport with the contract.  The plaintiff argues that section B8.33 of the contract allows the Forest Service to modify the contract "to prevent environmental degradation or resource damages, including, but not limited to, harm to habitat, plants, animals, cultural resources, or cave resources."  Section B8.34 allows the Forest Service to terminate the contract for the same reasons that justify a modification for environmental reasons.  If the contract was terminated for environmental reasons pursuant to section B8.34, the plaintiff would be entitled to reimbursement for out-of-pocket expenses under that section.

The plaintiff argues that because the Forest Service had informed it in the proposed modification that the sale area required "an increase to riparian buffers around stream courses and additional Northern Spotted Owl requirements," the contract was being modified for environmental reasons.  Therefore, the plaintiff argues, when the contract was terminated a year later, after the plaintiff failed to respond to the proposed modification, the contract was terminated for the same reasons.

The plaintiff's claim ignores the facts.  A catastrophic fire occurred in the area covered by the contract; that fact is undisputed.  In proposing to modify the contract, the Forest Service noted expressly that the damage caused by the fire satisfied the contract's definition of "Catastrophic Damage pursuant to [section] B2.133 – Damage by Catastrophe."  The proposed modification also expressly invoked section B8.222, allowing the Forest Service to terminate the contract for catastrophic damage if the plaintiff did not accept the proposed modification within 30 days.

It is true, as the plaintiff notes, that the Forest Service included additional environmental safeguards as part of the proposed modification.  Those safeguards were included, as the Forest Service explained in the proposed modification, "to account for the changed conditions due to effects caused by the" fire.  Nothing in the complaint suggests that the modification was proposed to account for new environmental measures; nothing in the complaint alleges that the Forest Service's purported explanation was a pretext.  From the face of the proposed modification, the changes were proposed in response to the catastrophic damage caused by the fire.  The Forest Service never cited or relied on the environmental sections of the contract in proposing the modifications.  The plaintiff's argument misreads the Forest Service's clear and unambiguous explanation for its proposed modification.

The termination also relied exclusively on the contract provisions dealing with damage by catastrophe.  It makes no mention of any environmental requirements.  The letter cites sections B2.133 and B8.222, the same sections on which the proposed modification was based.  In this sense, the case is distinguishable from *Seneca Sawmill Co. v. United States*, in which now-Chief Judge Kaplan considered whether the Forest Service's termination of a contract assertedly to comply with a court order was a pretext for terminating the contract on a ground otherwise prohibited by that contract.  130 Fed. Cl. 774 (2017).  Chief Judge Kaplan denied the defendant's motion to dismiss in *Seneca Sawmill*, finding that the factual record necessary to determine whether the Forest Service had properly terminated the contract was not yet before the

court. *Id.* at 779.  Here, in contrast, the plaintiff has supplied the relevant documents: the Forest Service's proposed modification and its termination for catastrophic damage.  These documents reflect on their face and leave no doubt that the Forest Service terminated the contract in response to the catastrophic fire, and not for some unrelated environmental reason.

Perhaps the plaintiff could have engaged during the year-long pendency of the proposed modification to clarify the Forest Service's position or negotiate a more favorable resolution.  The plaintiff did not do so.  The Forest Service has consistently and exclusively relied on the contract provisions covering catastrophic damage.  The plaintiff cannot try to pretend some other contract basis supported the decision to terminate the contract.  Claim I of the amended complaint fails to state a claim for relief under the contract and must be dismissed.

Claim II is dependent on Claim I and asserts delay damages for the length of time it took the defendant to consider proposing the environmental revisions to the contract contained in the proposed modification.  The plaintiff does not cite any contract provision that would, without more, entitle a purchaser to damages for delay.  Because Claim I of the amended complaint fails to state a claim under the contract, Claim II necessarily fails and must also be dismissed.

### B.    Claim IV

The fourth claim of the amended complaint does not cite any contract provision that the defendant is alleged to have violated.  The damages claimed under Claim IV appear to be a subset of the overall damages the plaintiff is seeking.  To the extent Claim IV depends on Claims I and II, it must fail.  To the extent the potential recovery of the amounts sought in Claim IV depends on Claim III, which is not being dismissed, the amounts may eventually be recovered under that claim.  Claim IV itself, however, without reliance on a breach of a provision of the contract, cannot stand.  Claim IV fails to state a claim and must be dismissed.

### C.    Claim III

The plaintiff seeks to preserve its claim by arguing that even if the contract was terminated due to catastrophe, the defendant still breached the contract by "fail[ing] to perform a rate redetermination in accordance with B8.32 and to incorporate [that redetermination] into the Modification for Catastrophe."  Section B8.32 requires the Forest Service, "in consultation with the Purchaser," to outline the effects of the catastrophe on a Sale Area Map.  Once the Sale Area Map is developed, section B8.32 outlines a process for the Forest Service to conduct a rate redetermination pursuant to section B3.32 of the contract.  Section B8.22 also makes clear that a contract modification will occur "following rate redetermination under [section] B3.32"; in other words, the rate redetermination is not an optional process.

Judge Meyers recently confronted the rate redetermination requirement of section B8.222 in a case with similar facts.  In *Freres Lumber Co., Inc. v. United States*, No. 21-1809, 2023 WL 2316297 (Fed. Cl. Feb. 28, 2023), the plaintiff alleged that the Forest Service had improperly terminated a timber-sale contract pursuant to that contract's section B8.222, identical to section B8.222 in Thomas Creek's contract.  *Id.*, at *2.  As in this case, the Forest Service attempted to terminate the contract after a forest fire had catastrophically damaged the sale area, and the

plaintiff sued.  *Id.*  The plaintiff alleged that the Forest Service did not terminate the contract, because it had failed to conduct the rate redetermination required by section B8.222 through sections B8.32 and B3.32, also identical to those in Thomas Creek's contract.  *Id.* at *2-3.  Judge Meyers read the language in section B8.222 as "impos[ing] limitations on the right to terminate." *Id.*  If the Forest Service failed to abide by those limitations, Judge Meyers reasoned that he could not "simply find a termination under B8.22 that does not comply with . . . B8.222."  *Id.* Finding that the plaintiff had plausibly alleged that the Forest Service did not properly terminate the contract because it failed to conduct the required pricing redetermination, Judge Meyers denied the motion to dismiss. *Id.* at *4.  *Freres Lumber* correctly stands for the proposition that the failure by the Forest Service to follow the rate-redetermination requirements set forth in the contract amounts to a failure to terminate properly under section B8.222.

The defendant acknowledges that terminations under section B8.222 must comply with the rate-redetermination protocol required by section B8.32, but it argues that the Forest Service did perform a compliant rate redetermination.  The defendant explains that the redetermination included reduced rates, and the Forest Service included these redetermined rates in the proposed modification.  The plaintiff attached to its amended complaint the document the defendant identifies as the rate redetermination, and that document reflects that for "Douglas-fir and other coniferous species except for Pacific Yew," the "Bid (Flat)" rate was reduced from $5.13 to $0.09, and the "Required Deposits Slash Disposal" was reduced from $3.22 to $0.98.

While this evidence demonstrates that the Forest Service's proposed modification included some proposed rate redeterminations, the plaintiff argues that the contract requires more.  A termination of the contract pursuant to section B8.222 requires the Forest Service to follow the precise procedure contained in section B8.32, and the plaintiff alleges the Forest Service did not do so.

Section B3.32, "Rate Redetermination after Catastrophic Damage," outlines the specific procedure the contracting officer must follow in conducting a compliant rate redetermination:

> Contracting Officer shall make an appraisal to determine for each species the catastrophe-caused difference between the appraised unit value of Included Timber remaining immediately prior to the catastrophe and the appraised unit value of existing and potential Included Timber immediately after the catastrophe. . . . Tentative Rates and Flat Rates in effect at the time of catastrophe shall be adjusted by said differences to become the redetermined rates for the purpose of a contract modification under B8.32.

The plaintiff acknowledges that the Forest Service included the two rate adjustments in its modification letter, but it argues that the proposed "modification of the two rates to which [the defendant] cites does not constitute a rate redetermination pursuant to Section B3.32."  The plaintiff asserts that the "Bid (Flat)" rate pertains to road maintenance, which "had been completed prior to the fire."  Likewise, the "Required Deposits Slash Disposal" rate "was not relevant following the fire, as the fire greatly reduced the slash disposal requirement (i.e., the fire burned most of the slash)."  The proposed modification valued the remaining timber at the pre-

9

fire rate, which, the plaintiff argues, "would have been adjusted to some amount below the Advertised rate of $5.13 per unit." The plaintiff argues that the unchanged value from before and after the catastrophe "indicates that no rate redetermination was performed and indicates that no appraisal was performed either." The defendant disputes the plaintiff's characterization of these items. On a motion to dismiss, however, a court may not resolve a disputed factual issue and must accept the allegations of the complaint as true.

On the complaint and its attachments, it is premature to determine whether the Forest Service correctly effected the termination as required by sections B8.222, B8.32, and B3.32 of the contract. The proposed modification specifies that its proposed rates apply to "Douglas-fir and other coniferous species except for Pacific Yew." These are species of trees, and it is therefore possible that the contracting officer undertook the required species-level rate redetermination. Whether the defendant's position is possible, however, is not the standard used to decide a motion to dismiss; it is whether the complaint plausibly alleges facts which, if true, entitle the plaintiff to relief. *Twombly*, 550 U.S. at 557. The plaintiff argues that the defendant did not perform the required species-level redetermination after the fire, and it is currently unknown whether the "Douglas-fir and other coniferous species" were the only species of timber trees in the sale area.

The parties' dispute over the rate redetermination is distinct from that in *Freres Lumber*. In that case, the plaintiff alleged that the Forest Service conducted no rate redetermination, while Thomas Creek challenges the sufficiency of the rate redetermination included in the proposed modification. Thomas Creek acknowledges that some rates were redetermined—rates for road maintenance and slash disposal—but it alleges that the contract required more. Although the redetermination includes some species-specific rate redeterminations, the stated value of the timber in the sale area remains unchanged from its value before the fire. The plaintiff does not allege precisely how much of the sale area was burned, but the defendant describes the fire as having "erupted and burned through the sale area." The plaintiff notes that there were "decked logs and felled logs on the sale area when it was burned." Both parties' accounts suggest that the fire burned timber included in the original contract value. Based on the defendant's acknowledgement of the extent of the fire, the plaintiff argues that, had the Forest Service conducted a compliant rate redetermination, the fire would have changed the value of the timber.

If the plaintiff's characterization of the rate redeterminations performed by the Forest Service is correct, as it is assumed to be for purposes of deciding a motion to dismiss, the Forest Service's overall redetermination falls short of what the contract provisions on a contract-termination-for-catastrophe require and under *Freres Lumber* would be ineffective. Given the factual dispute over the elements of the rate redetermination, the outcome here must be the same as in *Freres Lumber*. The motion to dismiss is denied as to Claim III of the amended complaint.

## V.   CONCLUSION

The amended complaint fails to state a claim as to Claims I, II, and IV. Those claims are dismissed with prejudice. The amended complaint has pleaded a viable claim that the defendant breached the contract by failing to perform the required rate redetermination in the manner required under the applicable provision of the contract. The defendant argues that the facts

reflect that the Forest Service complied with the contract's requirements; the plaintiff asserts otherwise.  This factual dispute cannot be resolved on a motion to dismiss but must await summary judgment or trial.

Pursuant to RCFC 12(a)(4)(A), the defendant shall file its answer to the amended complaint by **February 21, 2024**.  The time for discovery will be brief because the number of both relevant documents and witnesses are few.  Fact discovery will close on June 28, 2024; expert discovery will close on August 30, 2024.  The parties will file a joint status report by **September 12, 2024,** proposing a schedule for further proceedings.

The defendant's motion to dismiss is **GRANTED IN PART** and **DENIED IN PART**.  Claims I, II, and IV of the amended complaint are dismissed.  The motion is denied with respect to Claim III of the amended complaint.

It is so **ORDERED**.

s/ Richard A. Hertling
**Richard A. Hertling**
**Judge**